UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAC MCKINLEY BROWN, JR.,

                    Plaintiff,               Civil Action No. 12-12642
                                              Honorable Paul D. Borman
                                              Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 9, 10]**

Plaintiff Mac Mckinley Brown, Jr. ("Brown") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [8, 9, 10], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.      RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Brown is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [10] be GRANTED, Brown's Motions for Summary Judgment [8, 9] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

II.     **REPORT**

    A.      **Procedural History**

On March 31, 2009, Brown filed an application for DIB, alleging a disability onset date of June 2, 2008.  (Tr. 125-32).  This application was denied initially on May 29, 2009.  (Tr. 70-73).  Brown filed a timely request for an administrative hearing, which was held on September 3, 2010, before ALJ Peter Dowd.  (Tr. 41-67).  Brown, who was represented by attorney Kathleen Hengesbach, testified at the hearing, as did vocational expert ("VE") Ann Tremblay.  (*Id.*).  On October 26, 2010, the ALJ issued a written decision finding that Brown is not disabled.  (Tr. 28-36).  On May 9, 2012, the Appeals Council denied review.  (Tr. 1-3).  Brown filed for judicial review of the final decision on June 18, 2012.  (Doc. #1).

    B.      **Background**

        *1.      Disability Reports*

In a March 31, 2009 disability field office report, Brown reported that his alleged onset date was June 2, 2008.  (Tr. 155).

In a March 19, 2009 disability report, Brown indicated that his ability to work is limited by "arthritis in knee/surgery," high blood pressure, gastric bypass surgery, breathing problems, and "injured hernia and ankles."  (Tr. 160).  When describing how these conditions limit his ability to work, Brown stated:

> Unable to stand or walk for long [sic] periods of time because of pain. Mr. Brown recently had knee surgery 1/09 and can't perform his basic work activities.  Severe knee pain.

(*Id.*).  Brown reported that these conditions first interfered with his ability to work in 2007, but he did not become unable to work until June 2, 2008.  (*Id.*).  He indicated that he stopped working on that date because of his "condition."  (*Id.*).

Brown completed high school but had no further education.  (Tr. 166).  Prior to stopping

2

work, Brown worked as a fork truck driver from June 2000 to June 2006, and on an auto assembly line from June 2006 to June 2008. (Tr. 161). In those jobs, he was required to walk, stand, climb, stoop, kneel, crouch, and crawl two hours per day; sit seven hours per day; and reach and handle large objects eight hours per day. (*Id.*). He was frequently required to lift 20 pounds, and the heaviest weight he lifted was 30 pounds. (Tr. 161-62).

Brown indicated that he had treated with several medical providers regarding his ankle and knee conditions, high blood pressure, and gastric bypass surgery. (Tr. 163-65). At the time of the report, he was taking hydrocholorothiazide (for high blood pressure), ibuprofen (for swelling in his knee), and Vicodin (for pain). (Tr. 165). These medications produced side effects that included headaches, upset stomach, and drowsiness. (*Id.*). He further reported that he had had x-rays of his knee and chest, a "breathing test" and heart catheterization, and an EKG and treadmill stress test. (Tr. 166).

In a function report dated April 8, 2009, Brown reported that he lives in a house with his family. (Tr. 181). On a typical day, he cleans himself up, eats breakfast, stretches, attempts some light exercise, watches television, cares for his children, and goes to Powerhouse Gym to strengthen his left knee and quadriceps muscles. (*Id.*). He and his wife care for their 15-month old twins. (Tr. 182). When asked what he could do before the onset of his condition that he is no longer able to do, Brown indicated that he could walk and jog for longer periods of time. (*Id.*). His conditions affect his sleep, as the pain in his knee wakes him up at night. (*Id.*). He has no problems with personal care. (*Id.*). He is able to prepare meals a few times a week, although he cannot stand for long periods of time. (Tr. 183). He is able to wash dishes (while sitting down) and is able to do "quit[e] a bit" of housework if he can alternate between sitting and standing. (*Id.*). However, he does not do any yard work because it requires too much walking

and bending.  (Tr. 183-84).  He goes outside on a daily basis and is able to ride in a car and drive

(for short periods of time).  (Tr. 184).  He goes shopping with his wife if he is able to ride in an

Amigo motorized scooter.  (*Id.*).  He is able to pay bills, count change, handle a savings account,

and use a checkbook.   (*Id.*).   His hobbies include fishing, reading, watching television, and

writing poetry, although he has trouble getting comfortable while doing these things.  (Tr. 185).

He spends time with his wife and children and visits his mother and sister.  (*Id.*).   He has

problems getting along with family, friends, or neighbors, sometimes lashing out at them because

he is in pain.  (Tr. 186).

When asked to identify functions impacted by his condition, Brown checked lifting,

squatting,  bending,  standing,  walking,  sitting,  kneeling,  stair  climbing,  completing  tasks,

concentration, and getting along with others.  (*Id.*).  He indicated that he can walk and stand for

20-30  minutes  at  a  time,  and  can  sit  for  45  minutes  at  a  time.   (*Id.*).   He  has  difficulty

concentrating and completing tasks "because of pain."   (*Id.*).   He typically has no trouble

following written or spoken instructions, or getting along with authority figures.  (Tr. 186-87).

He has never been fired from a job because of problems getting along with other people.  (Tr.

187).  However, he does not handle stress well.  (*Id.*).  He has used a cane on an as needed basis

since March 2009.  (*Id.*).

In an undated disability appeals report, Brown reported that his condition had worsened

since his last report.  (Tr. 193).  His left knee was more painful than it had been, and he could no

longer drive long distances or climb stairs.  (Tr. 193, 195).

### 2.      *Brown's Hearing Testimony*

At the September 3, 2010 hearing before the ALJ, Brown testified that he is married and

lives in a house with his wife and children.  (Tr. 46).  He graduated from high school but did not

4

attend college.  (Tr. 48).  He has a driver's license, but had not driven in approximately two months because of pain.  (Tr. 58).

Brown testified that he has not worked since June 2008, when he left his job working on the assembly line at General Motors because of an ankle injury.  (Tr. 51-52).  Prior to that, he worked on the assembly line and as a fork truck driver at Delphi, as a janitor for Kelly Services, and unloading trucks and pricing merchandise at Meijer.  (Tr. 49-51).

Brown testified that he is 6'3" tall and currently weighs 240 pounds (down from an all-time high of 450 pounds).  (Tr. 53).  He has undergone successful gastric bypass surgery (as well as a tummy tuck and chest reduction).  (Tr. 53-56).  In addition, he had arthroscopic surgeries on his right ankle and left knee.  (*Id.*).  At the hearing, Brown testified that his primary problem was the pain in his left knee.  (Tr. 57).  His doctor had advised him that a full knee replacement was the "next step," but that was not recommended because of his age.  (*Id.*).  Brown testified that, because of the pain in his left knee, he cannot climb stairs.  (Tr. 60).  He also had "breathing problems" that he characterized as sleep apnea, but at the time of the hearing, he was no longer sleeping with a breathing machine.  (Tr. 59).

### 3.    Medical Evidence

#### (a)    Treating Physician Records

Several medical providers treated Brown's right ankle, left knee, and assisted with weight loss procedures.  For ease of reference, the Court will discuss each set of medical records by ailment.

#### (1)    Brown's Right Ankle

Brown injured his right ankle in August 2006.  (Tr. 369).  On October 10, 2007, Danielle Duncan, M.D., an orthopedic surgeon, performed arthroscopic surgery on this ankle.  (Tr. 389).  It appears that Brown returned to work after this surgery, although he testified at the hearing that

he stopped working in June 2008 because of continued ankle pain.  (Tr. 51-52).

### (2)      Brown's Weight Loss Surgeries

On February 12, 2008, Brown underwent successful gastric bypass surgery.  (Tr. 234-36).
Prior to the surgery, Brown weighed as much as 450 pounds and suffered from hypertension and
sleep apnea associated with obesity.  (Tr. 53, 243-45).  After this surgery, Brown was cleared to
return to work without restrictions on May 6, 2008.  (Tr. 241).[1]

### (3)      Brown's Left Knee

On July 31, 2008, Brown returned to see Dr. Duncan.  (Tr. 349-50).  At that time, Brown
reported that he had been experiencing throbbing, dull, and sharp pain in his left knee for more
than one year, which was worse after walking and sitting.  (Tr. 350).  He had been trying to
exercise to lose weight after his gastric bypass surgery and was down to 282 pounds.  (*Id.*).  X-
rays showed patellofemoral arthritis of the left knee.  (*Id.*).  Dr. Duncan recommended home
exercise and physical therapy.  (Tr. 349).

Brown next saw Dr. Duncan for left knee pain on November 3, 2008.  (Tr. 346).  At that
time, he had finished physical therapy – which he believed aggravated the knee pain – and was
continuing to exercise at Powerhouse Gym.  (*Id.*).  Dr. Duncan noted that Brown's quadriceps
muscles were "very, very weak" and recommended that he continue to work on strengthening
those muscles with a home exercise program.  (*Id.*).  On December 16, 2008, Brown again saw
Dr. Duncan, complaining that he still got occasional swelling in the knee and constantly had
some level of pain.  (Tr. 341).  On examination, Brown had effusion and crepitation with motion
of the knee, but excellent range of motion.  (*Id.*).  It appears that Dr. Duncan decided to try to
improve Brown's knee problems with another round of physical therapy in late December 2008

---

[1] Brown also underwent a related "tummy tuck" surgery on October 6, 2009 (Tr. 605-10) and, on
October 20, 2009, a chest reduction surgery (Tr. 615-19).

and early January 2009.  (Tr. 340).

Apparently, this second course of physical therapy failed to improve Brown's symptoms because Dr. Duncan performed left knee arthroscopy for patellofemoral arthritis on January 19, 2009.  (Tr. 323-25).  At follow-up visits on January 27, 2009, February 10, 2009, and February 19, 2009, Brown reported that he still had pain in his knee, particularly with activity and weightbearing.  (Tr. 330-31, 337, 492).  He still had visible muscle atrophy in the left thigh, and he was encouraged to modify his activities and exercise in regards to his symptoms and to continue with quadriceps strengthening to help stabilize the knee.  (Tr. 330).

There is very little evidence in the record relating to Brown's condition between March and August 2009.  On August 26, 2009, Dr. Duncan performed additional surgery on Brown's left knee (a left knee arthroscopy with micro fracture left patella and left femoral trochlea, as well as tibial tubercle osteotomy with iliac crest and cancellous bone allografting).  (Tr. 588-92). Dr. Duncan's notes from this surgery indicate that the prior arthroscopy was considered a failure and that Brown continued to complain of knee pain.  (Tr. 590).

In September 2009, Brown was walking beside his wife in a store as she rode in an Amigo motorized scooter, when he accidentally "slammed" his knee into the Amigo.  (Tr. 580). As a result, Brown developed a hematoma of the right knee, which required draining.  (*Id.*).

On December 3, 2009, Dr. Duncan opined that Brown could return to work on January 7, 2010, with the following restrictions:  "no climbing, ladders, no kneeling; must have sit/stand option."  (Tr. 641).  In February 2010, Brown began another round of physical therapy for his leg; however, he attended only one of seven scheduled sessions.  (Tr. 553-54).  Brown had another course of physical therapy for his left knee in the summer of 2010.  (Tr. 549, 627-33). Dr. Duncan examined Brown again on July 1, 2010.  (Tr. 640).  On that day, she completed

disability forms for Brown, noting that he could lift or carry up to 30 pounds "very occasionally," could stand and walk "as tolerated," sometimes up to four hours, could sit for periods of 30 minutes up to two hours, and should avoid pushing and pulling.  (Tr. 639-40).

*(b)*      *Consultative and Non-Examining Sources*

On May 22, 2009, state agency medical consultant Eric VanderHaagen, D.O., completed a physical residual functional capacity ("RFC") assessment.  (Tr. 538-45).  Dr. VanderHaagen examined Brown's records and concluded that he retained the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for 6 hours in an 8-hour work day, sit for 6 hours in an 8-hour work day, and frequently push/pull with his legs.  (Tr. 539).

*4.*      *Vocational Expert's Testimony*

Ann Tremblay testified as an independent vocational expert ("VE").  (Tr. 61-65).  The VE characterized Brown's past relevant work as a fork truck driver as semi-skilled in nature and light to medium in exertion; his work as an assembler as unskilled and light; his work as a janitor as unskilled and light to medium; and his work as a laborer as unskilled and medium to heavy.  (Tr. 63).  The ALJ asked the VE to imagine a claimant of Brown's age, education, and work experience, who could:

- Lift 30 pounds while seated;

- Repetitively lift 10 pounds or less;

- Stand and walk intermittently during an eight-hour workday for a total of two to eight hours;

- Sit for six hours of an eight-hour workday;

- Work only with a sit/stand option;

- Do no pushing or pulling with his legs or feet;

- Not be expected to operate foot pedals;

- Not climb ladders or scaffolds, kneel, crouch, or crawl;

- Occasionally climb stairs, balance items while standing and walking, and stoop; and

- Not have exposure to hazards (including unprotected heights and moving industrial machinery).

(Tr. 63-64).  The VE testified that there would be "an erosion of [the] light occupational base [sic] for an individual with those restrictions."  (Tr. 64).  As a result, the ALJ asked the VE whether there were sedentary occupations of an unskilled nature that the hypothetical individual could perform.  (*Id.*).  The VE gave three examples of such positions:  information clerk (2,500 jobs in the lower peninsula of Michigan), general office clerk (3,100 jobs), and assembler (1,500 jobs).  (*Id.*).  The ALJ twice asked the VE whether her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), and twice the VE affirmed that it was.  (Tr. 62, 65).

### C.   Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6ᵗʰ Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:   If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in

the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at \*7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Brown is not disabled under the Act.  At Step One, the ALJ found that Brown has not engaged in substantial gainful activity since June 2, 2008, his alleged onset date.  (Tr. 30).  At Step Two, the ALJ found that Brown has the severe impairments of (a) morbid obesity with associated hypertension and sleep apnea, with history of gastric bypass, tummy tuck, and chest reduction surgeries; (b) degenerative joint disease of the right ankle with arthroscopic surgery; and (c) degenerative joint disease of the left knee with arthroscopic surgeries.  (Tr. 31-33).  At Step Three, the ALJ found that Brown's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 33).

The ALJ then assessed Brown's residual functional capacity ("RFC"), concluding that he is capable of lifting weights of up to 20 pounds; standing and walking intermittently during an

eight-hour workday for a total of two of eight hours and sitting for six hours of an eight-hour workday, with a sit/stand option; no pushing or pulling with the legs or feet; no operating foot controls; no climbing of ladders, scaffolds, or ropes; no kneeling, crouching, or crawling; only occasional climbing of stairs, balancing of items while standing and walking, and stooping; and no exposure to hazards (including unprotected heights and moving industrial machinery). (Tr. 33-35).

At Step Four, the ALJ determined that Brown is unable to perform his past relevant work. (Tr. 35). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Brown is capable of performing a significant number of jobs that exist in the national economy. (Tr. 35-36). As a result, the ALJ concluded that Brown is not disabled under the Act. (Tr. 36).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

(internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.    Analysis**

The court first notes that it is extremely difficult to discern exactly what Brown's arguments are.  His six-page brief consists almost entirely of a compilation of block quotes of black letter case law, with virtually no accompanying analysis or application of that law to the facts of his case.  For example, Brown asserts – in the first heading of the "Legal Argument" section of his brief – that the ALJ erred in "failing to properly evaluate Mr. Brown's credibility

and the medical records of evidence." (Doc. #8 at 6). However, his brief contains no further discussion of any alleged errors in either of these respects by the ALJ. Similarly, Brown asserts later in his brief that "each element of the [ALJ's] hypothetical does not accurately describe Mr. Brown in all significant respects." (*Id.* at 7). Again, though, Brown does not explain how or in what way the ALJ's hypothetical fails to "accurately describe him," apparently leaving it to the Court to scour the record for evidence supporting his claims, which is insufficient. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones.") (internal quotations omitted). Nevertheless, for the sake of completeness, the Court will attempt to address Brown's under-developed arguments.

### 1.     *The ALJ's RFC Finding is Supported by Substantial Evidence*

Brown first asserts that "for a response to a hypothetical question to constitute substantial evidence, each element of a hypothetical must accurately describe the Claimant." (Doc. #8 at 7 (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)). Then, Brown simply concludes – without any analysis whatsoever – that "each element of the [ALJ's] hypothetical does not accurately describe [him] in all significant, relevant respects." (*Id.*). Brown fails, however, to identify any specific limitation(s) that the ALJ did not incorporate into his hypothetical. He also fails to point to any evidence in the record that supports additional limitations beyond those the ALJ found credible. While these failings alone are grounds for rejecting Brown's argument, *McPherson*, 125 F.3d at 995-96, the Court also finds his argument substantively meritless.

In his decision, the ALJ thoroughly reviewed and discussed the record evidence, concluding that Brown has the RFC to perform light exertional work, with certain additional limitations. (Tr. 33-35). Brown has not explained how this RFC finding was inaccurate or

improper. Rather, Brown cites numerous authorities discussing, in general terms, the amount of weight an ALJ should give to a treating physician's opinion. (Doc. #8 at 7-10). Brown's "argument" in this respect is misplaced, however, as the ALJ's RFC finding is entirely consistent with the medical opinion of Brown's treating physician, Dr. Duncan.[2] (Tr. 33, 639-40). Specifically, on July 1, 2010, Dr. Duncan completed disability forms for Brown, indicating that he can lift or carry up to 30 pounds "very occasionally," stand and walk "as tolerated," sometimes up to four hours, sit for periods of 30 minutes up to two hours, and should avoid pushing and pulling. (Tr. 639-40). Similarly, the ALJ concluded that Brown can lift 20 pounds, stand and walk a total of two of eight hours, sit for six of eight hours with a sit/stand option, do no pushing or pulling with his legs, and no operating of foot controls. (Tr. 33-35). Brown fails to provide any support for his assertions that the ALJ's findings differ from Dr. Duncan's opinion.[3]

Brown also argues – albeit in passing – that the ALJ erred in "failing to properly evaluate [his] credibility." (Doc. #8 at 6). After fully considering Brown's claimed limitations due to his physical conditions, the ALJ found that Brown was not fully credible. (Tr. 34). That finding is supported by substantial evidence and should not be disturbed. The Sixth Circuit has held that an ALJ is in the best position to observe a witness' demeanor and to make an appropriate evaluation as to his credibility. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Thus, an ALJ's credibility determination will not be disturbed "absent compelling

---

[2] In addition, the ALJ's RFC finding is consistent with the opinion of Dr. VanderHaagen (the state agency medical consultant), who opined that Brown retains the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and frequently push/pull with his legs. (Tr. 539).

[3] The Court also notes that on December 3, 2009, which is well after Brown's alleged onset date, Dr. Duncan opined that he could return to work on January 7, 2010, provided that his work did not involve climbing or kneeling, and allowed him a sit/stand option. (Tr. 641).

reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

When a complaint of pain is in issue, if the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of her pain are credible.  *Soc. Sec. Rul.* 96-7, 1996 WL 374186 (July 2, 1996). The ALJ did so here.  He noted that Brown engages in "essentially typical daily activities" (including caring for his personal needs, exercising at Powerhouse Gym, caring for his infant children, watching television, reading, playing video games, and visiting with family members). (Tr. 34).  The ALJ also noted that Brown "has not required further surgical intervention or other aggressive treatment[4] … and obtains good, if not total, relief from pain with prescribed medications when taken as instructed."  (*Id.*).  In addition, the ALJ observed that nothing in the medical record suggests limitations "that might reasonably prevent him from completing an eight-hour workday."  (*Id.*).  Notably, Brown makes no effort to contradict the ALJ on this point. In summary, the ALJ's credibility assessment is supported by substantial evidence and should not be disturbed.

2.     *Substantial Evidence Supports the ALJ's Finding that Brown Can Perform Jobs Existing in Significant Numbers in the National Economy*

Brown also asserts that none of the jobs identified by the VE in response to the ALJ's

---

[4] Brown asserts in his brief that his left knee will require knee replacement ("There is nothing left they can do for the knee except knee replacement.").  (Doc. #8 at 10).  This assertion mischaracterizes the evidence:  Brown testified at the hearing that a knee replacement is the last remaining option for *surgical* intervention.  (Tr. 57-58).  At this time, however, Brown's treating physician has not recommended a knee replacement but, instead, is treating him with physical therapy.  (*Id.*).  That Brown has engaged in the cited activities in the absence of knee replacement surgery further supports the ALJ's analysis on this point.

hypothetical actually fall within the sedentary, unskilled category according to the Dictionary of Occupational Titles ("DOT") and, therefore, the ALJ erred in relying on the VE's testimony. (Doc. #8 at 10).  This argument fails.

As discussed above, the ALJ found that Brown has the RFC to perform a reduced range of *light* work.  (Tr. 33-35).  Based on the restrictions identified by the ALJ, however, the VE testified that Brown's limitations might erode the light occupational base.  (Tr. 64).  As a result, the ALJ conservatively asked the VE whether any *sedentary*, unskilled jobs exist in the national economy that the hypothetical individual could perform.  (*Id.*).  This was appropriate, as the regulations specifically provide that, "If someone can do light work, we determine that he or she can also do sedentary work …."  20 C.F.R. §404.1567(b).  In response to the ALJ's question, the VE named three examples of such occupations – information clerk, general office clerk, and assembler.  (Tr. 64).  The ALJ twice asked the VE if her testimony was consistent with the DOT, and twice the VE affirmed that it was.  (Tr. 62, 65).  Brown's counsel had the opportunity to cross-examine the VE regarding any alleged inconsistencies between her testimony and the DOT but chose not to do so.  (Tr. 64-65).

### a.    The ALJ Properly Relied on the VE's Testimony

As an initial matter, once the ALJ asked the VE whether her testimony was consistent with the DOT, he had no independent obligation to verify the accuracy of that testimony.  *See Baker v. Comm'r of Soc. Sec.*, 2012 WL 2309063, at *4 (E.D. Mich. June 19, 2012).  The Sixth Circuit recently explained:

> Even if there were an inconsistency, the plaintiff has not pointed to any authority that the ALJ erred in his findings based on the VE's testimony, which went unchallenged by the plaintiff until after the ALJ issued his decision.  As an initial matter, neither the ALJ nor the VE is required to follow the DOT.  *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (holding that "the ALJ and consulting vocational experts are not bound by

the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's classifications"). The ALJ fully complied with SSR 00-4p when he asked the VE whether there was "any discrepancy between [her] opinions and the DOT standards for the requirements of the jobs [she] named." *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009) (holding that the ALJ fulfilled his duties when he asked the VE whether there was any "discrepancy between your opinions and the DOT standards," even if the VE did not disclose a conflict). As *Lindsley* makes clear, the ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p. *Id.* This obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT. The fact that plaintiff's counsel did not do so is not grounds for relief. *See Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008).

*Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168-69 (6th Cir. 2009). In this case, the ALJ specifically asked the VE – twice – whether her testimony was consistent with the DOT. (Tr. 62, 65). Twice, she responded that it was. (*Id.*). The ALJ was not required to make any further inquiry on this matter. *See Beinlich*, 345 F. App'x at 168-69. Moreover, despite expressly being given the opportunity to question the VE at the conclusion of the ALJ's questioning (Tr. 64-65), Brown's counsel chose not to question her about the skill level and/or occupational requirements of the occupations she identified. (Tr. 64-65). Thus, Brown waived any argument he might have had regarding this issue. *See Beinlich*, 345 F. App'x at 168-69; *Lindsley*, 560 F.3d at 606.

b. *The VE's Testimony Did Not Conflict with the DOT*

Even if Brown had not waived his argument that the VE's testimony conflicts with the DOT, this argument still fails on the merits. As *Social Security Ruling* 00-4p explains:

> The DOT contains information about most, but not all, occupations …. The term "occupation," as used in the DOT, refers to the collective description of [similar jobs performed in different workplaces]. Each occupation represents numerous jobs. Information about a particular job's requirements or about occupations not listed in the DOT may be available … from a VE's … experience in job placement or career counseling.
>
> The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is

17

> performed in specific settings.  A VE … may be able to provide more
> specific information about jobs or occupations than the DOT.

*Soc. Sec. Rul.* 00-4p, 2000 WL 1898704, at \*2-3 (Dec. 4, 2000).  Put simply, the VE's function

is not to simply regurgitate verbatim information found in the DOT.  And, as the Commissioner

correctly notes, the fact that the job title to which the VE testifies does not line up perfectly with

the DOT does not render the VE's testimony inconsistent with the DOT as a whole.  *See*

*Lindsley,* 560 F.3d at 605 ("'[t]he DOT contains information about most, *but not all*,

occupations.'    Moreover … the DOT's job classifications are collective descriptions of

'occupations' that can encompass numerous jobs …. The fact, therefore, that a VE and the DOT

might use different terminology to describe employment positions does not establish that a

conflict exists ….") (internal citations omitted) (emphasis in original).

In the case at hand, Brown has not shown any actual conflict between the VE's testimony

and the DOT.   For example, Brown alleges that the VE erred in identifying the job of

information clerk, asserting that, according to the DOT, this job is "sedentary with an SVP[5] of 4

semi skilled not unskilled."  (Doc. #8 at 10).  With regard to the title of "information clerk," the

DOT contains a category entitled "Receptionists and Information Clerks" that lists several types

of information clerks ranging in skill level, two of which fall into the "unskilled" category.  *See*

*e.g.* DOT 237.367-018 "Information Clerk" and 237-367-046 "Telephone Quotation Clerk."

Therefore, the mere fact that one type of "information clerk" is a skill level 4 job does not render

the VE's testimony erroneous.

With respect to the "general office clerk" occupation identified by the VE, Brown is

correct that this occupation, as specifically set forth in the DOT, is a skill level 4 occupation,

---

[5] The DOT lists a specific vocational preparation (SVP) time for each described occupation.  For instance, using the skill level definitions in 20 C.F.R. §404.1568, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9.  *See Soc. Sec. Rul.* 00-4p, 2000 WL 1898704, at \*3 (Dec. 4, 2000).

taking it out of the unskilled category. *See* DOT 219.362-010 "Clerk, General Office."

However, that does not mean that unskilled general office clerk occupations do not exist. As the

Sixth Circuit has stated, "not all occupations are included in the DOT, and the VE may use

terminology that differs from the terms used in the DOT . . . the mere fact that the DOT does not

list occupations with those precise terms does not establish that they do not exist." *Beinlich*, 345

F. App'x at 168.

Lastly, Brown asserts that the "assembler" occupation identified by the VE is light and

unskilled. (Doc. #8 at 10). Apparently, Brown overlooks the fact that the ALJ concluded that he

has the RFC to perform a reduced range of *light*, unskilled work. (Tr. 33). After listening to the

ALJ's hypothetical, and recognizing that there would be some erosion of the light occupational

base as a result of the included limitations, the VE testified, nevertheless, that such a claimant

could perform the job of assembler. (Tr. 64). As the Commissioner points out, "assembler" is a

very general occupation, many different types of which exist and are listed in the DOT. (Doc.

#10 at 14). The exertional requirements for each specific assembler job will vary and, although

some assembler jobs might have exertional requirements that exceed Brown's capabilities, the

VE gave uncontroverted testimony that assembler jobs exist that a person with Brown's

limitations can perform. (Tr. 64). As such, Brown has not established that the ALJ erred in

relying on the VE's testimony.

For all of the above reasons, and upon an independent review of the entire record, the

Court concludes that the ALJ's decision is correct and supported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion

for Summary Judgment [10] be GRANTED, Brown's Motions for Summary Judgment [8, 9] be

DENIED, and the ALJ's decision be AFFIRMED.

Dated: July 15, 2013                              s/David R. Grand
Ann Arbor, Michigan                               DAVID R. GRAND
                                                  United States Magistrate Judge


## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 15, 2013.

                                                  s/William Barkholz for Felicia M. Moses
                                                  FELICIA M. MOSES
                                                  Case Manager